**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERRELL D. CURRY,

        Plaintiff,

   v.

CALIFORNIA DEPARTMENT OF
CORRECTIONS, *et al.*,

        Defendants.

_____/

No. C-09-3408 EMC (pr)

**ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; AND
DENYING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

In this *pro se* prisoner's civil rights action, Terrell Curry claims that Defendants have violated his religious freedom rights by denying his requests for religious oil and a religious diet. Defendants now move for summary judgment and Mr. Curry opposes the motion. For the reasons discussed below, the Court **GRANTS** Defendants' motion for summary judgment on the religious oil claims and **DENIES** it without prejudice on the religious diet claims. The Court also **DENIES** Mr. Curry's motion for a preliminary injunction.

## II.   BACKGROUND

The following facts are undisputed unless otherwise noted:

Mr. Curry is incarcerated serving a sentence of life without the possibility of parole. He was incarcerated at Salinas Valley State Prison ("Salinas Valley") from 2002 through early 2009. He was transferred from Salinas Valley to Corcoran State Prison on January 15, 2009, and was transferred from Corcoran State Prison to Centinela State Prison on May 5, 2009. Duncan Decl., Ex.

United States District Court

For the Northern District of California

B.  The events and omissions that give rise to Mr. Curry's legal claims occurred from April 2007 through the filing of the complaint in July 2009.

Shetaut Neter is an "Ancient African Religion."  Complaint exhibits, Declaration of Terrell Curry dated July 13, 2009 ("Curry #1 Decl."), ¶ 2.  A practitioner of this religion is called a "Neterian."  *Id.*  Mr. Curry is a Neterian.  The current worldwide spiritual leader of the Shetaut Neter faith is Sebai Muata Ashby.  Plaintiff's Opposition to Motion For Summary Judgment, Ex. H, Declaration of Sebai Muata Ashby ("Ashby Decl."), ¶ 2.

Shetaut Neter "prescribe[s]," *id.*, "recommend[s]," *id.* at ¶ 4, or "mandate[s]" a type of vegan diet that "prohibits meat, dairy, eggs, wheat, refined sugar, and table salt."  *Id.*   This diet is known as the Kemetic diet.  *Id.*  It "is primarily composed of whole foods, raw vegetables and fruits," and is "designed to aid practitioners on the path of Shetaut Neter in their pursuit of spiritual enquiry, meditation, and yoga."  *Id.*[1]  Mr. Curry requested a Kemetic diet from the CDCR that was even stricter than that described by Ashby; among other things, his requested diet excluded genetically modified and irradiated food, and required that the vegetables and fruit be 80% raw/20% cooked. *See* Docket # 32-1, pp. 5, 12.

As a Neterian, Mr. Curry does ritual worship three times a day.  He washes his face and hands; does yoga postures, chants, meditations, prayers and offerings.  Curry # 1 Decl., ¶ 11. Incense is "supposed to be used for the fragrance smell to associate with a divine thought" but fire is not allowed in the cells, so Mr. Curry asked Defendants to grant him an accommodation authorizing him to order and possess "religious incense fragrance oil in place of incense sticks to burn for its fragrance, so to facilitate [him] during [his] prayers and meditation rituals which is central to [his] religious exercise."  *Id.*  (errors in source).

Defendant Landou was a chaplain at Salinas Valley during the relevant period.  He "provide[d] spiritual guidance to inmates in Salinas Valley's Facility C, conduct[ed] Islamic religious services and instruction, supervise[d] Shetaut Neter religious services, and schedule[d] and

---

[1]  According to Ashby, the Kemetic diet consists of food for the soul, food for the mind, and food for the physical body.  Ashby Decl., ¶ 5.  The "Kemetic diet" at issue in this case and discussed in this order refers to the food for the physical body portion of the three-part diet.

United States District Court

For the Northern District of California

conduct[ed] programming and activities."  Landou Decl., ¶ 2.  At Salinas Valley, inmates were allowed to possess religious artifacts and books used in the practice of their faiths, inmates received "nonscheduled opportunities for religious prayer, study, and reflection," and reasonable time and accommodations were provided for group religious services "in keeping with facility security and other necessary institutional operations and activities."  *Id.*  at ¶¶ 3-4.

For group services, chaplain Landou would generate pre-approved religious service lists at the beginning of each month, including a list for the C-Facility Shetaut Neter inmates to attend group religious services on Tuesdays at 1:00 p.m.  Mr. Curry was on the pre-approved lists for the weekly Shetaut Neter services from July 2008 through December 2008, and for a Shetaut Neter holiday service on December 26, 2008.  *Id.* at ¶¶ 6-7.  Although his name may have been on the list, Mr. Curry states that he was allowed to attend services far less frequently than on a weekly basis.

A.     <u>Mr. Curry's Inmate Appeals</u>

Mr. Curry filed two inmate appeals to obtain certain items for his Shetaut Neter religious activities.  In an April 11, 2007 inmate appeal, Mr. Curry requested that he be allowed to obtain and possess an "Ankh amulet, candles, incense oil, prayer mat, as well as religious books for study, & special dietary food items.  I would also like access time to the chapel to worship & study with other Neterian followers."  Docket # 32-1, p. 4.  Chaplain Moon partially granted the inmate appeal, and issued a chrono authorizing Mr. Curry to have an "Ankh amulet (religious medallion), prayer mat, books, and study materials from Sema Institute of Yoga, Miami, Florida."  *Id.* at 9.  Mr. Curry pursued his inmate appeal.  At the second level, chief deputy warden Neotti denied the request for religious oil, explaining: "All provided documents describing religious practices do not include 'oil' as an item necessary for Shetaut Neter African Religion.  Therefore, no oil was included on chrono per interview with Chaplain Moon."  *Id.* at 8.  Mr. Curry pursued his inmate appeal to the Director's Level, where it was denied.  *Id.* at 1.  The Director's Level decision stated that Mr. Curry had been provided with a chrono "listing those allowable religious items he requested."  *Id.*[2]

---

[2]  Mr. Curry's inmate appeals and the responses thereto also discussed the Kemetic diet request.  However, the details regarding the Kemetic diet request are not discussed in any depth in this order because the Court does not decide the Kemetic diet claims for reasons described later in this order.

**United States District Court**
For the Northern District of California

1    Mr. Curry filed a second inmate appeal related to religion issues on May 8, 2008. In this

2    appeal, Mr. Curry wrote that he wanted to obtain religious oil, to be excused from his job

3    assignment to conduct religious services on certain days, to be designated the Neterian inmate

4    coordinator, and to be allowed to purchase religious music. *See* Docket # 32-3, pp. 7-8. With regard

5    to the oil, he wrote:

6    > In the practice of my religion one aspect is the ritual of meditation
     > which requires several items to aid in such affective rituals. I am only
7    > requesting that I be allowed to purchase incense oils "*instead*" of
     > burning incenses which are prohibited. Incense oils can accommodate
8    > me in my ritual and can take the place of burning incense because the
     > effect of the fragrances is to help me develop divine thoughts during
9    > my daily meditations & prayers. The incense oil will be placed on my
     > body during meditations.

10

11   Docket # 32-3, p. 7. Mr. Curry attached to his inmate appeal several handouts, *none* of which

12   mention the use of oil as part of any ritual or practice of Shetaut Neter. *See id.* at 9-15. Incense is

13   listed as one of the basic necessities for effective daily worship, but no mention is made in the

14   handouts of any substitute for incense. *See id.* at 12, 13, 16. One of the handouts that discusses

15   meditation practices in general and is not limited to Neterians, suggests that the meditating person

16   should have certain basics for meditating and is "free to choose other items that resonate with [his or

17   her] spiritual consciousness." *Id.* at 17. That this meditation guidance is not specific to Neterians is

18   evident from its suggestion that the meditating person also obtain an icon according to that person's

19   spiritual inclination and religion, *e.g.*, an ancient Egyptian deity, "an Eastern icon such as Buddha,"

20   or a "Christian Icon such as Jesus or Mary." *Id.* at 16. The worldwide spiritual leader of Shetaut

21   Neter did not mention religious oil as a requisite of Shetaut Neter practices in his declaration

22   prepared for this case; he noted that the spiritual diet portion of Shetaut Neter was meditation, but

23   did not describe any items required for such meditation. *See* Ashby Decl., ¶ 5.

24   Mr. Curry's May 8, 2008 inmate appeal was partially granted at the first level on June 12,

25   2008: (1) Mr. Curry would be given a reasonable accommodation to attend specific religious

26   services; (2) Mr. Curry would not be designated as the Neterian inmate coordinator because he had

27   not provided proof of being an approved inmate coordinator; and (3) Mr. Curry would not be

28   allowed to order any items that were not approved by the institution or were not from approved

4

United States District Court

For the Northern District of California

1  vendors.  *See* Docket # 32-3.  The first level appeal response noted that Mr. Curry "continues to

2  request to receive a memorandum approving him to order religious music and incense oils" and that

3  during the interview, Mr. Curry said "that the Muslim Chaplain is working with him on purchasing

4  incense oils."  *Id.*  Mr. Curry pursued his May 8, 2008 inmate appeal to the second level, where the

5  appeal again was partially granted.  With regard to the request for religious oil, the appeal was

6  denied because the documentation Mr. Curry provided that described the religious practices "do not

7  include 'oil' as an item necessary for Shetaut Neter African Religion."  Docket # 32-3, p. 5.   At the

8  Director's Level, the request for oil again was denied.  Docket # 32-3, p. 2.

9  B.    Religious Oil At Salinas Valley

10         Salinas Valley chaplain Landau explained the evolution of the restrictions on usage and

11  possession of religious oil.  In the past, religious oil was stored in the chapel at Salinas Valley, and

12  inmates were allowed to use oil only during the chapel services.

13              Inmate possession of religious oil was strictly controlled because often
            the religious oils that inmates sought were combustible and burning oil
14              within inmate cells would create safety concerns.  In addition, oils
            have the potential to be traded by inmates as currency and effectively
15              violate the CDCR prohibition on inmates possessing money.  *See* Cal.
            Code Regs. tit. 15, § 3006(b).  [¶] Inmates filed administrative appeals
16              documenting their religious needs for oil, and over time, the Salinas
            Valley policy regarding the purchase and possession of oil was
17              revised. . . . By late January 2009, the Salinas Valley policy was
            revised to allow any inmate to seek authorization for the possession of
18              a limited amount of religious oil in their cell if they went through the
            proper procedure to request it.

19

20  Landou Decl., ¶¶ 10-11.

21         By late 2007, "Muslim and Protestant inmates, having presented evidence to support their

22  need for oil, obtained authorization to have it in their possession."  Docket # 42, p. 108

23  (Bonnefield's Resp. To Request For Admission No. 11).  In 2008, inmates from "a variety of

24  religious groups possessed religious oils obtained through trade with Muslim and/or Protestant

25  inmates."  *Id.*  The policy then was reviewed and, by late 2009, Salinas Valley's "policy was revised

26  to allow any inmate to seek authorization for the possession of religious oil if they went through the

27  proper procedure to request it."  *Id.* at 109.

28

United States District Court

For the Northern District of California

The parties disagree whether Mr. Curry was given access to religious oil during the weekly group services in the chapel.  Mr. Curry denies that he was allowed access to religious oil and Chaplain Landou states that Mr. Curry was allowed such access.  *Compare* Declaration of Terrell D. Curry in Support of Opposition To Defendants' Summary Judgment Motion, ("Curry #2 Decl."), ¶ 11 *with* Landou Decl., ¶¶ 10-11.  For purposes of Defendants' summary judgment motion, non-movant Mr. Curry's version is accepted as true.

Muslim prisoners at Salinas Valley were allowed to purchase and possess religious oil in their cells at some unidentified point before August 2007.  *See* Docket # 42, p. 101 (Pina Decl., ¶¶ 2-3.)  There was oil donated for use by only Muslims in the chapel who could not pay for their own prayer oil.  *Id.* at ¶ 3.[3]  Mr. Curry was told by Landou that the oil was only for the Muslim prisoners and that Mr. Curry could not have any because he was not approved to use oil.  Curry #2 Decl., ¶ 11.

## III.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")  The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

---

[3]  The parties have not presented evidence as to whether the oil has been consecrated or otherwise subjected to a ritual that gives the oil a special meaning to members of a particular religion.  This is true for the oil for the Muslim and Protestant inmates, as well as for Mr. Curry's requested oil.

**United States District Court**
For the Northern District of California

1   designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324

2   (citations omitted.)  The Court's function on a summary judgment motion is not to make credibility

3   determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec.*

4   *Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be

5   viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the

6   facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.

7        On issues as to which the moving party bears the burden of proof at trial – such as the

8   qualified immunity defense in this case – he must come forward with evidence which would entitle

9   him to a directed verdict if the evidence went uncontroverted at trial.  *See Houghton v. South*, 965

10  F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each

11  issue material to his affirmative defense.  *Id.* at 1537.  Once the moving party has come forward with

12  this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of

13  a genuine issue of fact on the defense.

14       A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

15  based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v.*

16  *McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as

17  opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

18  plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not

19  based purely on his belief but on his personal knowledge).  Plaintiff's complaint is considered as

20  evidence because it was signed under penalty of perjury.

## IV.   DISCUSSION

A.    Religious Oil Claims

    1.    RLUIPA Claim

24       The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-

25  1, provides that no state may impose a "substantial burden" on a prisoner's exercise of religion

26  unless the action or policy in question provides the least restrictive means of serving a compelling

27  governmental interest. 42 U.S.C. § 2000cc-1(a).  The plaintiff bears the burden of coming forward

28  with evidence demonstrating the state's action or policy constituted a substantial burden on his

**United States District Court**
For the Northern District of California

1  exercise of religion. *Warsoldier v. Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005). The focus of

2  this initial inquiry necessarily is on the manner in which the Plaintiff's religious exercise is

3  impacted, rather than on the reasonableness of the facility's policy or regulation. *Id.* at 995.

4      "Religious exercise," for RLUIPA purposes, includes "any exercise of religion, whether or

5  not compelled by, or central to, a system of religious belief." *San Jose Christian College v. Morgan*

6  *Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004). The exercise of religion may involve not only the belief

7  and profession, but the performance of physical acts such as group assembly for worship. *See*

8  *Greene v. Solano County Jail*, 513 F.3d 982, 987 (9th Cir. 2008). The "religious exercise" protected

9  by RLUIPA is not defined too generally (*e.g.*, the exercise of Shetaut Neter as a whole), but most

10  must consider specific aspects of that exercise. *See id.* at 987-88. Thus, for instance, in *Greene*, the

11  Ninth Circuit reversed a district court's decision to grant the jail summary judgment on a claim that

12  a policy of prohibiting maximum security inmates from participating in group worship violated the

13  inmate's rights under RLUIPA and other provisions. The Ninth Circuit identified the religious

14  exercise as the ability to engage in group worship, not the general practice of Christianity. *Greene*,

15  513 F.3d at 983.

16      By analogy to *Greene*, the religious exercise in Mr. Curry's religious oil claim was the thrice

17  daily worship ritual and not the broader general practice of the Shetaut Neter religion. During the

18  thrice daily worship ritual that he performed in his cell, Mr. Curry washed his face and hands, and

19  did "yoga postures, chants, meditate, prayers and offerings." Docket # 1, p. 15. The issue there is

20  whether prohibiting oil that Mr. Curry wanted to use in connection with that ritual imposed a

21  substantial burden on Mr. Curry's exercise of religion. Plaintiff has the initial burden of

22  demonstrating prison officials imposed a substantial burden on the exercise of his religion beliefs.

23  *Warsoldier*, 418 F.3d at 994.

24      RLUIPA does not define "substantial burden." *See* 42 U.S.C. § 2000cc-5. The Ninth Circuit,

25  however, has held that a "substantial burden" on "religious exercise" is one that imposes "a

26  *significantly great* restriction or onus upon such exercise." *San Jose Christian College*, 360 F.3d at

27  1034 (emphasis added); *see, e.g., id.* at 1035 (rejecting the religious college's argument that the

28  "substantial burden" was "its inability to use its own property 'to carry on its mission[s] of Christian

United States District Court

For the Northern District of California

education and transmitting its religious beliefs," and determining that zoning ordinance imposed no restriction on religious exercise and instead merely required the religious college to submit a complete application). The Ninth Circuit observed in *San Jose Christian College* that the burden was not enough to "render religious exercise effectively impracticable." 360 F.3d at 1035. In *Warsolider*, the court held a burden is substantial under RLUIPA "'where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Warsoldier*, 418 F.3d at 995, quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981)). Stated differently, a prison policy substantially burdens religious practice if it puts significant pressure on the inmates "'to abandon their religious beliefs.'" *Shakur v. Schiro*, 514 F.3d 878, 888 (9th Cir. 2008), quoting *Warsolider*, 418 F.3d at 995.[4]

---

[4] More recently, the Ninth Circuit, sitting *en banc*, construed the "substantial burden" term under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA"). *See Navajo Nation v. U.S. Forest Service,* 535 F.3d 1024, 1033 (9thCir. 2008) (*en banc*):

> Under RFRA, a "substantial burden" is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*[Sherbert v. Verner*, 374 U.S. 398 (1963)]) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*[Wisconsin v. Yoder*, 406 U.S. 205 (1972)]). Any burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a "substantial burden" within the meaning of RFRA.

*Navajo Nation*, 535 F.3d at 1069-70. In *Navajo Nation*, the court concluded that the government-approved use of artificial snow with a small amount of wastewater on government-owned parkland on a sacred mountain was not a substantial burden on plaintiffs' religious activities on the mountains, including the spiritual fulfillment they derive from such activities, where plaintiffs continued to have virtually unlimited access to the mountain for religious and cultural purposes. *See id.* at 1063, 1070 n.12. "[A] government action that decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion is not" a substantial burden. *Id.* at 1063.

The court "express[ed] no opinion as to the standards to be applied in RLUIPA actions." *Navajo Nation*, 535 F.3d at 1007 n.23. Nonetheless, *Navajo Nation* is instructive because it based its definition of a "substantial burden" on the same line of cases used as authority for the RLUIPA "substantial burden" test, *i.e.*, *Thomas v. Review Bd.*, 450 U.S. at 717-18 – cited in both *Warsoldier* and *Shakur* – is also cited in *Navajo Nation* as an elaboration of the test from the *Sherbert* case. Additionally, the *Navajo Nation* standard appears consistent with the articulation of the test in *Warsoldier*, although perhaps not with *San Jose Christian College*'s "significantly great restriction or onus upon such exercise" if that is viewed as a different standard rather than an umbrella description of the test from *Warsoldier*.

United States District Court

For the Northern District of California

Mr. Curry failed to show a triable issue that the denial of scented oil placed a substantial burden on his religious exercise with the meaning of RLUIPA. He is able to carry out most nearly all other aspects of his religious faith including the thrice daily worship ritual in his cell. He does not contest the prohibition on incense; only his desire to substitute the scent with oil. Mr. Curry does not dispute that he was allowed to and did conduct Shetaut Neter worship three times a day without the oil. He was able to conduct the worship ritual that included washing his face and hands, practicing yoga postures, reciting prayers, chanting and meditating. Mr. Curry also does not dispute that he was allowed to have his Ankh amulet, prayer mat, books, and study materials to use in his worship ritual if he desired. Mr. Curry indicates that he wanted the oil for its fragrance. Without the oil, he had to do "most of [his] rituals in the cells which is very difficult being inches from a smelly toilet." Docket # 1, p. 16 (errors in source). However, the allowance of oil would not change the location of the ritual: he would still be doing the ritual in the cell. He presents no evidence that the toilet could not be cleaned or that his body had to point in a specific direction to engage in the worship such that his head had to be "inches from a smelly toilet" when he worshiped. The denial of oil while perhaps presenting some impediment, does not constitute a "significantly great restriction" upon the exercise of his religious beliefs, nor does it make that religious exercise "effectively impracticable." *San Jose Christian College*, 360 F.3d at 1034, 1035.

The same analysis applies to the absence of oil during the group worship services Mr. Curry attended in the latter half of 2008. Even if oil was not made available for Shetaut Neter group worship services, the undisputed evidence shows that Mr. Curry was allowed to attend some Shetaut Neter group religious services in the prison chapel in the latter half of 2008 and to attend a special Shetaut Neter holiday service on December 26, 2008. *Cf. Greene*, 513 F.3d at 988.

Several courts have found there is no substantial burden on religious exercise where a prisoner lacked access to prayer oils, *see Riggins v. Clarke*, 403 F. App'x 292, 2010 WL 4670444, **3 (9th Cir. 2010) (affirming summary judgment for defendants; "nothing in the record suggests that a lack of prayer oils placed a substantial burden on Appellant's ability to practice his religion, and it is clear that Appellant's request for transfer of funds to purchase these oils was eventually processed"), *Davis v. Powell*, 2011 WL 4344251, *11 (S. D. Cal. 2011) (dismissing RLUIPA

claim); a prison restricted third-party purchases of prayer oil, *Smith v. Marshall*, 2011 WL 4794941, *1 (9th Cir. 2011) (upholding dismissal of RLUIPA claim); and a prisoner was allowed to attend a candle-lighting ceremony but without the company of other inmates, *Barendt v. Gibbons*, 2012 WL 210525 (9th Cir. 2012) (affirming summary judgment for defendants on RLUIPA claim; plaintiff "failed to introduce evidence that this limited restriction on a group religious service substantially burdened his ability to exercise his religion"). *See also Campbell v. Alameida*, 295 F. App'x 130, 2008 WL 4415151 (9th Cir. 2008) (affirming summary judgment for defendants on qualified immunity grounds against RLUIPA claim that plaintiff was refused permission to possess religious oil in his cell because he was not a Muslim). *See also Parnell v. Tucker*, 2011 WL 4842461 (9th Cir. 2011) (affirming summary judgment for defendants on RLUIPA claim that a prisoner was precluded from certain prayer services during Ramadan); *Sefeldeen v. Alameida*, 238 F. App'x 204, 2007 WL 1585599 (9th Cir. 2007) (affirming summary judgment for defendant prison officials against RLUIPA claim; plaintiff "identifies no evidence in the record suggesting that eating the offered vegetarian meal plan violated any principles of his personal religious belief"). *But see Charles v. Verhagen*, 220 F. Supp. 2d 937, 947-48 (W. D. Wis. 2002), *aff'd*, 348 F.3d 601, 611 (7th Cir. 2003) (denial of request for Islamic prayer oil constitutes substantial burden).

Thus, even viewing the evidence in the light most favorable to Mr. Curry, no reasonable jury could conclude that prison officials substantially burdened his religious exercise by denying his requests for oil. Defendants are entitled to judgment as a matter of law on the claim that the denial of oil to Mr. Curry violated his rights under RLUIPA.

In addition to Defendants' entitlement to judgment on the merits of the claim, Plaintiff's request for injunctive relief with regard to the oil appears to be moot because there is no evidence that Mr. Curry is denied access to oil at his current prison, Centinela State Prison, where he has been incarcerated for almost two years. *See Alvarez v. Hill*, 667 F.3d 1061, 1061-65 (9th Cir. 2012).

Lastly, the parties agree that Mr. Curry is not entitled to recover monetary damages under RLUIPA. *See* Opposition, pp. 2-3; Reply, p. 12; *see generally Sossamon v. Texas*, 131 S. Ct. 1651,

United States District Court

For the Northern District of California

1663 (2011); *Alvarez*, 667 F.3d at 1061; *cf. Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 n.3 (9th Cir. 2011).[5]

2.     Free Exercise Claim

This claim, in which Mr. Curry asserts a violation of the Free Exercise Clause of the First Amendment to the U.S. Constitution is brought under 42 U.S.C. § 1983, which "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983).

The First Amendment guarantees the right to the free exercise of religion.  The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security.  *See O'Lone v. Shabazz*, 482 U.S. 342, 348-49 (1987).  In order to establish a free exercise violation, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests.  *See Shakur v. Schriro*, *supra*, 514 F.3d at 883-84.  As Mr. Curry has offered evidence that he was denied access to oil in his cell and that he had a sincerely held religious belief in the need for oil for his worship service, the analysis of his Free Exercise claim turns on whether the denial was reasonably related to legitimate penological interests.  *See O'Lone*, 482 U.S. at 349 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

The Supreme Court has identified four factors for Courts to consider when determining whether a regulation or practice is reasonably related to legitimate penological interests:  (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4)

---

[5] Although the Ninth Circuit has not decided whether damages would be available under RLUIPA against defendants in their individual capacities, *see Florer*, 639 F.3d 922 n.3, several other circuits have determined that such damages are not available.  *See Rendelman v. Rouse*, 569 F.3d 182, 188-89 (4th Cir. 2009); *Nelson v. Miller*, 570 F.3d 868, 889 (7th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007), *abrogated on other grounds by Sossamon*, 131 S. Ct. 1651.

**United States District Court**
For the Northern District of California

the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." *Turner*, 482 U.S. at 89-90.  The task in considering the *Turner* factors is not to balance the four factors, but, rather, to determine whether the state shows a "reasonable" relation between the policy and legitimate penological objectives, rather than simply a "logical" one. *Beard v. Banks*, 548 U.S. 521, 533 (2006).  While all justifiable inferences must be drawn in the prisoner-plaintiff's favor with respect to matters of disputed fact, in disputed matters of professional judgment the Court's inferences must accord deference to the views of prison authorities.  *See id.* at 529-30.  Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.  *Id.* at 530.

With respect to the first *Turner* factor, the evidence shows a rational and valid connection between the restriction on inmate access to oil and a legitimate governmental interest.  The undisputed evidence shows that prison officials were trying to prevent oil from being used as a potential currency in the inmate population.  Inmate possession of money was prohibited by regulation, *see* 15 Cal. Code Regs. § 3006, and there were increased safety risks and potential for inmate disputes if the inmates could trade oil.  The prison had a legitimate interest in controlling potential contraband.  *See Pell v. Procunier*, 417 U.S. 817, 822-23 (1974) (identifying four central penological objectives as deterrence (by making incarceration undesirable), protection (by quarantining criminal offenders), rehabilitation, and ensuring internal security of the prison facility).  There also is undisputed evidence that often the religious oils were combustible and that burning oil within inmate cells posed fire safety concerns.  The oil policy was eventually changed (*i.e.*, as of 2009, any inmate was allowed to seek authorization for the possession of a limited amount of oil in his cell) but that change does not entirely negate the legitimacy of the governmental interests that supported the earlier policy.  The ban was modified because it was not realistically enforceable, not because it was not supported by a governmental interest.  The undisputed evidence was that in 2007-2008, Salinas Valley officials were concerned about providing religious accommodations to inmates unless there was a documented religious need for the accommodation, and that the oil policy was in transition.  The Muslim and Protestant inmates, having presented evidence to support their need for

United States District Court

For the Northern District of California

religious oil, obtained authorization to have it in their possession first.  As a result of trading between inmates from a variety of religious groups and the Muslims and Protestant inmates, inmates from a variety of religious groups possessed religious oil by 2008.  The policy was reviewed and revised, so that by late 2009, any inmate could seek authorization for possession of religious oil. The change in policy is not proof of the irrationality of the earlier policy and instead appears to be a constructive attempt to afford First Amendment freedoms to inmates in an orderly manner. Defendants have satisfied the first *Turner* factor, in that Defendants have shown a logical connection between the policy of not allowing inmates to possess oil in their cells and the legitimate need for ensuring prison security.  *See O'Lone*, 482 U.S. at 350 (finding policy not allowing inmates to return from outside work detail to attend Jumu'ah services logically connected to prison's legitimate security and administrative concerns).

As noted earlier, the second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates."  *Turner*, 482 U.S. at 89-90.  The denial of religious oil did not deprive Mr. Curry of all means of exercising his Shetaut Neter religion.  *Cf. Overton v. Bazzetta*, 539 U.S. 126, 135 (2008) (limits on prison visitation passed muster under *Turner* test because prisoner could write letters and make telephone calls to persons not allowed to visit).  It is not disputed that Mr. Curry was able to engage in some Neterian worship without the oil. *See O'Lone*, 482 U.S. at 352-53 (although there were no alternative means for the prisoners on work detail to attend Jumu'ah services, the prisoners nevertheless retained their ability to participate in other Muslim religious ceremonies and practices, and that ability supported the reasonableness of the restriction).  Mr. Curry could attend occasional Shetaut Neter group worship services and he could engage in the in-cell worship three times a day, during which he could wash his face and hands, practice yoga postures, recite prayers, chant and mediate.  There also were means, other than worship rituals, for Mr. Curry to exercise his Neterian religion: he could study the Shetaut Neter written materials he had, and could practice the Neterian teachings he had learned.  *See* Curry # 1 Decl., ¶ 5.

The third *Turner* factor requires the Court to consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison

United States District Court

For the Northern District of California

1  resources generally." *Turner*, 482 U.S. at 90.  Accommodating the request to possess oil in the cell

2  would have had a negative impact on institutional safety because it would have facilitated the inmate

3  hoarding and trading of oil that prison officials were trying to avoid at the time they disallowed oil.

4  That the oil might have been subjected to trade with other inmates is not pure speculation in light of

5  his evidence that Mr. Curry ran an underground purchasing service for other inmates.  *See* Curry #2

6  Decl., ¶¶ 6-7.  Additionally, allowing individual exceptions for personal religious beliefs held by

7  only one prisoner (or a very small group of prisoners), and based only on his say-so of a religious

8  need for the item, could be very disruptive to prison officials, given that prison authorities might be

9  flooded with requests of all sorts for oil or other religious artifacts.  *See Henderson v. Terhune*, 379

10  F.3d 709, 714 (9th Cir. 2004).

11       The fourth *Turner* factor requires the Court to consider whether there is an "absence of ready

12  alternatives" to the prison policy.  *Turner*, 482 U.S. at 90.  The burden is on the prisoner challenging

13  the regulation to show that there are obvious, easy alternatives to the regulation.  *See O'Lone*, 482

14  U.S. at 350; *see also Mauro v. Arpaio*, 188 F.3d 1054, 1063 (9th Cir. 1999).  The same safety

15  concern arising from oil being the subject of trade among inmates also weighs in favor of

16  Defendants on the fourth *Turner* factor.

17       Having considered the various Turner factors, the Court concludes that Mr. Curry does not

18  raise a triable issue of fact that his right to free exercise of religion was improperly impinged upon

19  by Defendants.  Defendants are entitled to judgment in their favor on Mr. Curry's First Amendment

20  claim.

21       3.    Equal Protection Claim

22       Mr. Curry contends that prison officials treated him differently than inmates of other faiths.

23  To survive summary judgment on his equal protection claim, Mr. Curry must show a triable issue of

24  fact that Defendants intentionally treated Mr. Curry differently from similarly situated inmates.

25  *See McCollum v. California Dep't of Corrections and Rehabilitation*, 647 F.3d 870, 880-81 (9th Cir.

26  2011) (granting summary judgment for prison officials on Wiccan prison chaplain's equal protection

27  claim where plaintiff-chaplain, among other things, had failed to articulate which clergy were

28  similarly situated to him).  Mr. Curry has failed to do so.  Mr. Curry does not dispute that the

**United States District Court**

For the Northern District of California

inmates who first received access to religious oil in 2007-2008 (*i.e.*, the Muslims and Protestants) were those who provided documentation of the religious need for it and has not raised a triable issue of fact that he did submit such documentation.  It is undisputed that Mr. Curry's request to be allowed to possess oil was due to his failure to submit documentation that oil is required for a Shetaut Neter practice.  On the evidence in the record, no reasonable jury could find that Defendants denied his request for oil due to impermissible discriminatory intent against Neterian inmates. Defendants are entitled to judgment on the Fourteenth Amendment claim.

> 4.      Qualified Immunity Defense

Defendants also are entitled to qualified immunity against the First and Fourteenth Amendment claims with regard to the religious oil.  The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether an official is entitled to qualified immunity, the Court must decide whether the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s requirement that qualified immunity analysis proceed in a particular sequence).  "[I]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201.  The Court has concluded that the evidence fails to show a violation of Mr. Curry's First or Fourteenth Amendment rights with regard to the religious oil.  Therefore, Defendants prevail on the first prong of the *Saucier* test.  As a matter of law, Defendants are entitled to qualified immunity against the First and Fourteenth Amendment claims with regard to the religious oil.

B.      Religious Diet Request

There is an evidentiary problem with Defendants' motion for summary judgment on the Kemetic diet claims that requires that portion of the motion to be denied.  Specifically, a declaration essential to Defendants' entitlement to summary judgment was submitted with the reply brief rather

than with the motion for summary judgment.  Mr. Curry filed an objection to the reply evidence on the ground that it should have been presented in the moving papers.  Docket # 48.  The Court agrees. The late submission of the declaration deprived Mr. Curry of the opportunity to address and contest it in his opposition.  For this reason, the Court will deny the motion for summary judgment on the religious diet request and allow Defendants to file the motion again, this time properly supporting their moving papers.

L. Maurino, the Departmental Food Administrator for the CDCR, provided two declarations. Her first declaration (Docket # 31) was filed with the motion for summary judgment.  In that declaration, Maurino discussed the three religious diets that were currently available, discussed the costs of those diets, and stated that Mr. Curry's requested diet would cost as much or more than existing diets.  She spoke in general terms of the costs and difficulties of providing another dietary choice to inmates, and did not calculate the expected costs of providing the diet that Mr. Curry had requested.  In her second declaration (Docket # 44), filed with Defendants' reply brief, Maurino did the math and showed that the requested Kemetic diet would cost $57,286.95 to $66,506.95 per year – apparently more than thirty times more expensive than the standard diet and more than eighteen times more expensive than the kosher diet (which was the most expensive religious diet). *See* Maurino # 2 Decl., ¶¶ 11-16 (calculating cost of Mr. Curry's requested diet); Maurino # 1 Decl., ¶ 12 (listing costs of other diets).  Maurino also provided some more detailed information about the requested diet and the CDCR food service options in her second declaration.  Defendants also submitted a declaration from a correctional administrator, B. Hedrick, who provided information about the security impact of a prison staff member leaving the prison to shop for groceries to prepare Mr. Curry's requested diet.  Docket # 45.  Hedrick also provided information about the costs and concerns of obtaining food from a non-registered vendor.

A party moving for summary judgment must show that he is "entitled to judgment as a matter of law," *see* Fed. R. Civ. P. 56(a), but the way he does that depends on what he must prove at

United States District Court

For the Northern District of California

1  trial.  Where there is a shifting burden of proof – as in an RLUIPA claim[6] – it appears that a

2  defendant's burden in a motion for summary judgment depends on the ground(s) on which he

3  intends to prevail.  If a defendant urges in his moving papers only that plaintiff cannot shoulder his

4  initial burden, defendant can point out the absence of evidence to support plaintiff's claim.

5   *See Celotex*, 477 U.S. at 324.  However, if defendant also urges in his moving papers that

6  (regardless whether plaintiff satisfies his initial burden) defendant satisfies the burden that will shift

7  to him, his showing must be sufficient for the Court to hold that no reasonable trier of fact could find

8  other than for him on each matter as to which he has the burden of persuasion at trial.  *See generally*

9  *Houghton*, 965 F.2d at 1536.  In the RLUIPA context, that means that a defendant could move for

10  summary judgment by (1) pointing to plaintiff's inability to demonstrate a substantial burden on his

11  religious exercise, and/or (2) pointing to evidence that the government used the least restrictive

12  means to satisfy a compelling state interest when it burdened the religious exercise.  In Mr. Curry's

13  case, Defendants emphasized the first kind of showing in their moving papers, and then shifted to

14  second kind of showing in their reply papers.  And the "compelling state interest" evidence that was

15  presented shifted from the administrative convenience of limited diet options to the extraordinary

16  cost of Mr. Curry's requested diet.  That was impermissible.  Defendants' reply evidence is critical

17  to the RLUIPA analysis because it brings into focus whether the rejection of the requested diet was

18  the least restrictive means to further a compelling government purpose.  The reply evidence went far

19  beyond simply responding to matters first raised in the opposition.

20       Rule 56(e) allows the Court to issue any "appropriate order" when a party has failed to

21  properly support an assertion of fact.  An appropriate order under the circumstances is to deny

22  Defendants' motion for summary judgment on the Kemetic diet claims and to allow Defendants to

23  make a new motion in which they submit all the evidence with their moving papers rather than

24  _____

25       [6]  In an RLUIPA claim, the plaintiff first must show that the government has imposed a
"substantial burden" on his "religious exercise."  *See Greene*, 513 F.3d at 989.  Once the plaintiff

26  makes that showing, "it becomes the defendant's responsibility to establish that the burden furthers
'a compelling governmental interest,' and does so by 'the least restrictive means.'"  *Id.*  At trial, the

27  onus would be on the plaintiff to satisfy his burden in his case-in-chief, and a directed verdict could
be entered in defendant's favor if plaintiff did not do so.  However, if the plaintiff did satisfy his

28  burden, the burden would shift to the defendant to satisfy the defendant's burden.

United States District Court
For the Northern District of California

1    waiting until the reply to submit critical evidence.  This will allow the *pro se* Plaintiff an opportunity

2    to prepare a meaningful opposition while having in hand the evidence that purports to demonstrate

3    the compelling government interest.  Requiring a new motion rather than simply permitting Plaintiff

4    to file a rebuttal to the existing reply also will allow both Plaintiff and Defendants to address two

5    other matters.  First, the parties are invited to discuss, and cite to cases discussing, whether cost and

6    cost containment are compelling government interests for purposes of the RLUIPA analysis.

7    Second, Defendants' evidence shows the cost per inmate per day of providing the standard and three

8    existing religious diets, but it is not completely clear whether those costs include overhead or just

9    the purchase price for the food.  Defendants should explain in general terms the method by which

10   the cost per inmate per day for the several diet options were calculated.  Also, Maurino's first

11   declaration states that Exhibit A to that declaration shows the cost per day per inmate of each diet.

12   *See* Maurino #1 Decl., ¶ 12, but the Court does not see that information on the exhibit.  Defendants

13   should identify the place on that exhibit where the information is located or provide a new exhibit.

14   The Court wants the information so that it may make apples-to-apples comparisons of the costs for

15   the various diet options that appear to be essential to the analysis.

16   C.    Mr. Curry's Motion For Preliminary Injunction

17        Mr. Curry has filed a motion for preliminary injunction with regard to the religious diet

18   request.[7]  He asks for an order enjoining Defendants to provide him a Kemetic diet, to change the

19   CDCR's religious diet program to include an optional vegan diet, and to train food handlers and

20   custody staff in the handling of the vegan food.

21        "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the

22   merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

23   balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

24   *Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  *Winter* did not, however,

---

26        [7]  This is Mr. Curry's third attempt to obtain a preliminary injunction.  The Court denied Mr.
     Curry's first motion for preliminary injunction for failing to serve notice on the adverse party.
27   Docket # 4, p. 4.  The Court later denied his motion to renew the preliminary injunction motion for
     failing to establish that he had served notice on the adverse party and for failing to establish that he
28   was likely to succeed on the merits or that there were serious questions going to the merits of his
     claims.  *See* Docket # 17, pp. 4-6.

United States District Court

For the Northern District of California

1  completely reject the validity of the sliding scale approach to preliminary injunctions.  *Alliance for*

2  *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).  Under the "sliding scale"

3  approach used in the Ninth Circuit – also dubbed the "serious question" test in *Alliance for Wild*

4  *Rockies* – "the elements of the preliminary injunction test are balanced, so that a stronger showing of

5  one element may offset a weaker showing of another."  *Id.* at 1131.  Thus, even after *Winter*,

6  "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff

7  can support issuance of an injunction, assuming the other two elements of the *Winter* test are also

8  met."  *Id.* at 1132 (citations and internal quotation marks omitted).

9       Mr. Curry's motion for preliminary injunction is **DENIED**.  (Docket # 46.)  Mr. Curry has

10  not satisfied the *Winter* standard for a preliminary injunction.  The evidence now in the record[8]

11  shows that Mr. Curry has very little, if any, chance of prevailing on the merits of his RLUIPA, First

12  Amendment or Fourteenth Amendment claims with regard to the Kemetic diet he has demanded

13  from prison officials due to its extraordinary cost relative to the other diets available to prisoners.

14  *See*  Maurino Decl. # 1, ¶ 12; Maurino #2 Decl., ¶ 16.  Mr. Curry also has not satisfied the *Alliance*

15  *for Wild Rockies* standard because (1) he does not face irreparable harm – Shetaut Neter "recognizes

16  that sometimes strict adherence to the Kemetic diet may not be possible for inmates in institutions

17  due to the institution not being set up to meet some of the non-traditional dietary requirements,"

18  Ashby Decl., ¶ 10, and (2) requiring the CDCR to provide a diet that is estimated to cost more than

19  fifty times as much as the standard diet is not in the public interest.

20  ### V.   CONCLUSION

21       For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN**

22  **PART**.  (Docket # 37.)  Defendants are entitled to judgment as a matter of law on Plaintiff's

23  RLUIPA, First Amendment and Fourteenth Amendment claims with regard to the denial of his

24

25

26       [8]  The record before the Court now includes the evidence submitted by the parties for
Defendants' motion for summary judgment.  Although the reply declaration of Maurino has caused

27  the Court to deny without prejudice the motion for summary judgment on the Kemetic diet issues,
the Court can and has considered it in connection with Mr. Curry's motion for a preliminary

28  injunction.

1   requests for oil.  The Court denies without prejudice Defendants' motion for summary judgment on

2   the religious diet claims.  Plaintiff's motion for a preliminary injunction is **DENIED**.  (Docket # 46.)

3          The following briefing schedule is now set for Defendants to file a new motion for summary

4   judgment on the religious diet claims:

5              1       No later than **May 4, 2012**, Defendants must file and serve the motion for

6   summary judgment on the religious diet claims.

7              2.      No later than **June 8, 2012**, Plaintiff must file and serve on Defendants'

8   counsel his opposition to the motion for summary judgment.

9              3.      No later than **June 25, 2012**, Defendants must file and serve their reply brief,

10  if any.

11

12         IT IS SO ORDERED.

13

14  Dated:  March 21, 2012

15                                         _____
                                           EDWARD M. CHEN
16                                         United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California