**United States District Court**
For the Northern District of California

1
2
3
4
5                              UNITED STATES DISTRICT COURT

6                            NORTHERN DISTRICT OF CALIFORNIA

7

8   TERRELL D. CURRY,                           No. C-09-3408 EMC (pr)

9            Plaintiff,

10       v.                                     **ORDER GRANTING DEFENDANTS'
                                                RENEWED MOTION FOR SUMMARY
11  CALIFORNIA DEPARTMENT OF                    JUDGMENT**
    CORRECTIONS; *et al.*,
12                                              **(Docket No. 58)**
             Defendants.
13  _____/

14

15

16                          **I.    INTRODUCTION**

17       In this *pro se* prisoner's civil rights action, Terrell Curry claims that Defendants violated his

18  religious freedom rights by denying his requests for religious oil and a religious diet.  Several

19  months ago, Defendants moved for summary judgment on the religious oil and religious diet claims.

20  The Court granted summary judgment in favor of Defendants on the religious oil claims, and denied

21  without prejudice their motion on the religious diet claims.  Defendants now renew their motion for

22  summary judgment on the religious diet claims.  For the reasons discussed below, the Court

23  **GRANTS** Defendants' renewed motion for summary judgment.

24                          **II.    BACKGROUND**

25       The following facts are undisputed unless otherwise noted:

26       Curry is serving a sentence of life imprisonment without the possibility of parole.  He was

27  incarcerated at Salinas Valley State Prison ("Salinas Valley") from 2002 through early 2009.  He

28  was transferred from Salinas Valley to Corcoran State Prison on January 15, 2009, and was

**United States District Court**
For the Northern District of California

transferred from Corcoran State Prison to Centinela State Prison on May 5, 2009.  Duncan Decl., Ex. B.  Curry was still at Centinela when he filed this action.  The events and omissions that give rise to Curry's legal claims occurred from April 2007 through the filing of the complaint in July 2009.[1]

A.    The Kemetic Diet Request

Shetaut Neter is an "Ancient African Religion."  Docket # 1, p. 12.  A practitioner of this religion is called a "Neterian."  *Id.*  Curry is a Neterian.  The current worldwide spiritual leader of the Shetaut Neter faith is Sebai Muata Ashby.  Docket # 42, p. 66.

Shetaut Neter "prescribe[s]," *id.*, "recommend[s]," *id.* at 67, or "mandate[s]" a type of vegan diet that "prohibits meat, dairy, eggs, wheat, refined sugar, and table salt."  *Id.*  This diet is known as the Kemetic diet.  *Id.*  It "is primarily composed of whole foods, raw vegetables and fruits," and is "designed to aid practitioners on the path of Shetaut Neter in their pursuit of spiritual enquiry, meditation, and yoga."  *Id.*[2]

Curry is a Neterian.  He states that it is his "sincerely held belief to eat a vegan diet."  Docket # 42, p. 24.

Curry requested a Kemetic diet from prison officials that was even stricter than that described in the Ashby Declaration.  In his 2007 inmate appeal, he stated that he wanted a "vegetarian diet that is mandated by [his] faith.  The diet that is required is described on page 3."  Docket # 32-1, p. 5.  Page 3 of the "Special Accommodations for inmates who desire to practice Neterian Religion" handout from the Temple Shetaut Neter (hereinafter, the "Special Accommodations handout") that was attached to the inmate appeal stated:

> Provision of the Kemetic Diet for Followers of Shetaut Neter Religion: The Kemetic Diet is the form of food nourishment described in the scriptures of Shetaut Neter of Ancient Kemet. It enjoins that the diet should be:
>
> I.    *Swadj* - Fresh Green foods, Vegetarian - (Basis of the special diet)
> ii.   At least 80% raw vegetables and fruits - 20% cooked

---

[1]  Curry filed a separate action in another district concerning the alleged denial of his religious diet request for a later period.  *See* Docket # 1 in *El Heru Kweli Ra Uhuru and Ausar Amsukau Raakhu v. Cate*, U.S.D.C. So. Dist. Cal. Case No. 12-CV-229H NLS.

[2]  According to Ashby, the Kemetic diet consists of food for the soul, food for the mind, and food for the physical body.  Docket # 42, p. 67.  The "Kemetic diet" at issue in this case and discussed in this order refers to the food for the physical body portion of the three-part diet.

United States District Court
For the Northern District of California

iii.     no meat (cow, chicken, fish), no dairy, no eggs
iv.     no wheat - substitute Kamut or Spelt
v.      no candy, refined sugar or table salt (for table salt substitute with *sea salt*)
vi.     no genetically modified food
vii.    no irradiated food
viii.   substitute nut milk, or rice or soy milk (provides calcium and protein) for cow milk
ix.     substitute Organic Food Bars for granola.

Docket # 32-1, p. 12 (footnotes omitted).

Curry also joined with other inmates in a group appeal that requested the diet described in the handout.  *See* Docket # 32; Docket # 32-1, p. 17 (list of members of group appeal include Curry).  In that group appeal, the author wrote:  "The Kemetic Diet mandates a vegetarian diet at least 80% raw vegetable and fruits 20% cooked.  (See Exh. A 3 of 3.)  We are prohibited from eating any of the detrimental foods listed in Exhibit B."  Docket # 32-2, p. 6.  Exhibit A to that group appeal is Special Accommodations handout.  The "detrimental foods" listed in Exhibit B were many in number and included salted nuts, salted foods, sulfur dioxide in dried fruits, hydrogenated oils, margarine, "[a]ny foods with preservatives," "[s]alads that are not fresh," "[c]ooked vegetables that are more than one day old," and "[p]rocessed foods of all kinds – generally anything that does not come from the produce section of the supermarket."  Docket # 32-2, p. 23.

Curry has "a medical condition which requires [him] to not eat any dairy, or wheat, products."  Docket # 42, p. 23.  He avoids dairy products because he is lactose intolerant, and avoids wheat products because he is allergic to wheat.  When he eats wheat or dairy products, he becomes ill and such illness prevents him from "studying and practicing [his] spiritual teachings."  *Id.* at 24.  He did not mention these health concerns in his inmate appeal requesting the Kemetic diet.

In his opposition to the renewed motion for summary judgment, Curry states that he "*never* presented any request for vegan-organic meals.  Nor has he said anything about food having to be non-genetically modified or non-irradiated."  Docket # 71, p. 2. (This contention is discussed at length later in this order.)

Curry purchased many snack foods at the prison canteen that did not comport with a Kemetic diet.  Canteen receipts show that Curry purchased fish, chicken, cereal, sausage, beef, spam, beef ramen, chicken ramen, saltines, crackers, potato chips, flavored chips, pork rinds, cheese crunches,

United States District Court
For the Northern District of California

1  cheese spread, beans, flour tortillas, candy, cookies, pastries, donuts, garlic powder, mayonnaise, soy

2  sauce, hot sauce, creamer, cupcakes, and hot cocoa.  *See* Docket # 61.  Curry states that he made

3  these purchases on behalf of other inmates in a scheme to aid those other inmates in avoiding their

4  restitution obligations.  Docket # 42, p. 24.  Also, Curry traded items that he could not eat for items

5  that he could eat, such as almonds, sunflower seeds, fruits and vegetables.  *Id.*  He did, at times,

6  "have to eat food that is prohibited due to hunger pains and [his] nutrition being deficient."  *Id.* at

7  24-25.

8  B.     CDCR Diet Options

9         Currently, the CDCR provides four dietary options for inmates at its adult prisons, "which

10 are designed to reasonably accommodate all of CDCR inmates' religious and dietary needs at a cost

11 that does not impose an unreasonable financial burden on CDCR and the State of California" the

12 standard diet, the vegetarian diet, the Jewish kosher diet, and the religious-meat-alternate diet.

13 Docket # 59, p. 2.

14        The vegetarian diet is available for inmates who wish to eat a meat-free diet for religious,

15 personal, or ethical reasons.  The CDCR offers the vegetarian diet to "accommodate a variety of

16 inmates in a simplified, cost effective manner" who seek to exclude meat from their diets, rather

17 than attempting to design specialized diets for each inmate or group of inmates who want to exclude

18 meat.  *Id.*  The vegetarian diet "is an ovo-lacto vegetarian diet," meaning that it excludes animal

19 flesh but includes dairy and egg products as well as fruits, vegetables, beans and grains.  *Id.*

20        The religious-meat-alternate diet substitutes halal meat for the regular meat that is served in

21 the standard diet.  *Id.* at 3.  Peanut butter and cheese are offered as substitutes for any meat served at

22 breakfast and lunch.  Docket # 31, p. 3.  The religious-meat-alternate diet was introduced to CDCR

23 prisons in 2010, and is currently served to approximately 3,736 inmates.  *Id.*

24        The Jewish kosher diet "consists of pre-cooked, shelf-stable kosher dinners and pre-cooked

25 side items that are assembled by prison staff without cooking."  *Id.*  The Jewish kosher diet was

26 introduced to CDCR in 2006, and costs more than three times as much as the standard diet.  *See id.*

27        In addition to the foregoing diet options, CDCR offers two medical diets.  Docket # 59, p. 5.

28 The renal diet is designed for inmates on kidney dialysis and consists of foods that are low in

1   sodium, potassium and phosphorous.  The gluten-free diet is designed for inmates who have celiac

2   disease and are gluten intolerant, and substitutes corn tortillas or potatoes for wheat bread.  Neither

3   of the medical diets contains whole grains, soy, tofu, rice milk or nut milk.  Both of the medical diets

4   contain meat and dairy, and do not necessarily exclude genetically modified or irradiated food items.

5   *Id.*

6   C.    Costs

7         Defendants present evidence about the cost of providing the Kemetic diet requested as well

8   as the costs of the other non-medical diets.  L. Maurino, a registered dietitian and currently the

9   Departmental Food Administrator for the CDCR, explained the costs of the various diet options.  *See*

10  Docket # 59, pp. 3, 6-7.

11        The costs per inmate per day to purchase the food – excluding the costs of ordering, storage

12  and preparation – for the various diets are as follows:  $2.82 for the standard diet; $3.20 for the

13  vegetarian diet; $3.50 for the religious-meat-alternate diet; $9.28 for the Jewish-kosher diet; and

14  approximately $26.03 for the Kemetic diet requested.  *See id.* at 3, 6.

15        The $26.03 figure for the Kemetic diet does not take into account numerous special expenses

16  related to that diet.  The biggest issue stems from the requirement that the Kemetic diet exclude

17  genetically modified ("GMO") and irradiated foods, as that requirement necessitates a different

18  approach to obtaining and preparing the food.  The vast majority of the food produced and sold in

19  the U.S. is conventionally produced rather than organic, and is not labeled with respect to its genetic

20  modification and irradiation.  Docket # 59, p. 4.  The best way to avoid GMO and irradiated food is

21  to consume organic foods.  *Id.*  Organic foods could be purchased at a Whole Foods Market, one of

22  the very limited number of food suppliers that could satisfy the Kemetic diet.  Docket # 59, p. 4, 6.

23  Dietician Maurino does not believe that existing vendors could satisfy the requested Kemetic diet.

24  CDCR's food is purchased through a competitive bidding process among food brokers, none of

25  whom certify the food as organic.  The major food vendors "have a few lines of organic produce and

26  vegan snacks, but they do not offer the breadth of organic-vegan foods necessary for a balanced diet

27  that excludes all genetically modified or irradiated foods."  *Id*. at 5.

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The shopping expense for the requested Kemetic diet is great. "Whole Foods Market is not a registered food vendor with the State of California and will not deliver food to CDCR prisons." *Id.* at 6  The nearest Whole Foods Market to Curry's prison is 35 miles away. The labor cost of a prison employee shopping for Curry weekly would be $8,112 to $9,464 per year. *Id.* Additionally there would be a transportation cost of approximately $1,820 per year for the vehicle. *Id.*

The food preparation expense is significant because the requested Kemetic diet would require individual preparation and service. The labor cost for the preparation, service and clean-up of the Kemetic meals would be approximately $28,740 to $37,960 per year. *Id.* There also would be an additional expected (apparently one-time) cost of approximately $2,250 to purchase and install storage lock boxes to secure the foods because "special or different foods in prison are likely to be stolen by other inmates." *Id.* at 7.

As noted above, the cost of the food alone for the Kemetic diet is significantly higher than for the other diets. Maurino calculated that the estimated annual food cost for a nutritionally adequate organic vegan diet for Curry would be $9,500.95 ($26.03 per day). *Id.*

In sum, Maurino calculated that the "total cost for purchasing, shopping, preparing, delivering, and storing Curry's requested vegan diet would be approximately $50,422.95 to $60,994.95 per year." *Id.* at 7. This is at least thirty times the cost to feed the average inmate. CDCR's total yearly food budget is approximately $233 million, which includes the direct cost of the food and the labor cost related to the food. *Id.* With 140,000 inmates to be fed, this budget equates to $1664 per inmate per year.

Maurino also noted some side effects of providing the requested Kemetic diet. "Accommodating Curry's request for a vegan diet at a yearly cost of $50,422.95 to $60,994.95 would inevitably impact CDCR's ability to accommodate other inmates' religious dietary needs." *Id.* at 7. Also, offering a Kemetic diet to accommodate this religion would encourage other inmates to request specialized diets and that would "defeat the purpose of running a simplified, inexpensive, and easily administered food service for inmates." *Id.* at 8. Additionally, purchasing food from Whole Foods Market for one or a small group of inmates would cause the CDCR to miss the cost savings of purchasing food in bulk from one of the major food brokers or vendors. *Id.* at 7; Docket #

United States District Court

For the Northern District of California

60, p. 3.  Further, the possibility of food borne illnesses could increase if food is purchased from a non-registered vendor that has not been vetted for food safety and quality.  Docket # 59, p. 7; Docket # 60, p. 3.

D.    <u>Security</u>

Obtaining, preparing and delivering the Kemetic diet requested by Curry would divert correctional staff members who otherwise would be available to supervise and control inmates. Even the correctional supervising cooks have custodial responsibilities that include supervision of inmates.  Docket # 60, p. 2.  "[R]equiring a member of the correctional staff to shop for a prisoner at an offsite grocery store would detract from the care, custody, and control of the inmates and would adversely affect prison safety and security."  *Id.*  It would take about 6-7 hours each week for a prison employee to take care of Curry's Kemetic diet, *i.e.*, to drive to and from the nearest Whole Foods Market, shop, check the food in to the prison and deliver the food to the central kitchen. Docket # 59, p. 6.

### III.    <u>LEGAL STANDARD FOR SUMMARY JUDGMENT</u>

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")  The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324

**United States District Court**
For the Northern District of California

1   (citations omitted.)  The Court's function on a summary judgment motion is not to make credibility

2   determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec.*

3   *Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be

4   viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the

5   facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.

6          On issues as to which the moving party bears the burden of proof at trial – such as the

7   qualified immunity defense in this case – he must come forward with evidence which would entitle

8   him to a directed verdict if the evidence went uncontroverted at trial.  *See Houghton v. South*, 965

9   F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each

10  issue material to his affirmative defense.  *Id.* at 1537.  Once the moving party has come forward with

11  this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of

12  a genuine issue of fact on the defense.

13         A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

14  based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v.*

15  *McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as

16  opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

17  plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not

18  based purely on his belief but on his personal knowledge).  Plaintiff's complaint is considered as

19  evidence because it was signed under penalty of perjury.

20                          **IV.   DISCUSSION**

21  A.      RLUIPA Claim

22         The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-

23  1, provides that no state may impose a "substantial burden" on a prisoner's exercise of religion

24  unless the action or policy in question provides the least restrictive means of serving a compelling

25  governmental interest. 42 U.S.C. § 2000cc-1(a).

26  ///

27  ///

28  ///

8

**United States District Court**
For the Northern District of California

1. <u>Plaintiff Meets His Initial Burden To Raise A Triable Issue Of Fact On The Existence</u>
<u>of A Substantial Burden On His Religious Exercise</u>

The plaintiff bears the burden of coming forward with evidence demonstrating the state's action or policy constituted a substantial burden on his exercise of religion. *Warsoldier v. Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005). The focus of this initial inquiry necessarily is on the manner in which the plaintiff's religious exercise is impacted, rather than on the reasonableness of the facility's policy or regulation. *Id.* at 995.

"Religious exercise," for RLUIPA purposes, includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *San Jose Christian College v. Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004). The exercise of religion may involve not only the belief and profession, but the performance of physical acts such as group assembly for worship. *See Greene v. Solano County Jail*, 513 F.3d 982, 987 (9th Cir. 2008).

RLUIPA does not define "substantial burden." *See* 42 U.S.C. § 2000cc-5. The Ninth Circuit, however, has held that a "substantial burden" on "religious exercise" is one that imposes "a *significantly great* restriction or onus upon such exercise." *San Jose Christian College*, 360 F.3d at 1034 (emphasis added).

The evidence is sufficient to show a triable issue of fact that Defendants imposed a substantial burden on Curry's religious exercise. Curry presents evidence that the denial of the Kemetic diet request resulted in him being forced to choose between eating a diet inconsistent with his religion or changing his religious beliefs to be consistent with the available diet options. *See Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008) ("extent to which the prison's policies" resulting in a denial of religious dietary request "pressured Shakur to betray his religious beliefs is another factual dispute to be resolved by the district court"); *id.* (quoting *Warsoldier*, 418 F.3d at 996) ("prison policy that 'intentionally puts significant pressure on inmates . . . to abandon their religious beliefs . . . imposes a substantial burden on [the inmate's religious practices'").

Defendants urge that Curry's snack food consumption shows that his claimed need for a Kemetic diet is not a sincerely held belief. Curry purchased many foods at the prison canteen that were not compatible with a Kemetic diet, although he presents evidence that the purchases were for

9

1   the benefit of other inmates.  The evidence would be relevant to the sincerity of Curry's religious

2   beliefs.  *See generally Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2000) ("prison officials may

3   appropriately question whether a prisoner's religiosity, asserted as the basis for a requested

4   accommodation, is authentic"); *Resnick v. Adams*, 348 F.3d 763, 771 n.8 (9th Cir. 2003) (quoting

5   *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987) ("It is appropriate for prison authorities to

6   deny a special diet if an inmate is not sincere in his religious beliefs."); *Lute v. Jonson*, 2012 WL

7   913749, *7 (D. Idaho 2012) ("Although 'backsliding' or nonobservance of a religious practice is not

8   dispositive, it is evidence of a prisoner's religious insincerity. . .  Purchasing nonkosher foods–both

9   before and after his kosher diet request–is completely inconsistent with Plaintiff's professed

10  religious belief.")  Although Curry's purchases of many foods inconsistent with the Kemetic diet

11  likely would make a strong impact on a jury, it cannot be said as a matter of law that his canteen

12  activities show that his religious beliefs were insincere.

13          2.       Defendants Meet Their Burden To Show They Used The Least Restrictive Means To

14                   Further A Compelling State Interest

15          Once the plaintiff has met his initial burden of showing a substantial burden on his exercise

16  of religion, the burden shifts to the government to show that the burden imposed is in furtherance of

17  a "compelling" government interest (rather than simply a legitimate penological interest), and that it

18  achieves the compelling interest by the least restrictive means.  *See* 42 U.S.C. § 2000cc-1(a);

19  *Shakur*, 514 F.3d at 889.

20          The Supreme Court has made clear that RLUIPA-based requests do not automatically trump

21  other concerns:

22                  We do not read RLUIPA to elevate accommodation of religious
                    observances over an institution's need to maintain order and safety.
23                  Our decisions indicate that an accommodation must be measured so
                    that it does not override other significant interests. . . . [¶]  We have
24                  no cause to believe that RLUIPA would not be applied in an
                    appropriately balanced way, with particular sensitivity to security
25                  concerns. While the Act adopts a "compelling governmental interest"
                    standard, see *supra* at 715, "[c]ontext matters" in the application of
26                  that standard. *See Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S.Ct.
                    2325, 156 L.Ed.2d 304 (2003). . . . Lawmakers supporting RLUIPA
27                  were mindful of the urgency of discipline, order, safety, and security
                    in penal institutions. *See, e.g.*, 139 Cong. Rec. 26190 (1993) (remarks
28                  of Sen. Hatch). They anticipated that courts would apply the Act's

United States District Court

For the Northern District of California

1   standard with "due deference to the experience and expertise of prison
2   and jail administrators in establishing necessary regulations and
    procedures to maintain good order, security and discipline, *consistent*
    *with consideration of costs and limited resources.*" Joint Statement
3   16699 (quoting S.Rep. No. 103-111, at 10).

4   *Cutter*, 544 U.S. at 722-23 (footnote omitted; final emphasis added).

5          Defendants meet their burden to show that their rejection of the Kemetic diet request was the

6   least restrictive means to further compelling government interests. Curry does not come forward

7   with any admissible evidence to controvert Defendants' evidence on the burden of accommodating

8   his request for a Kemetic diet. The undisputed evidence shows that prison officials' rejection of the

9   Kemetic diet request in favor of the existing religious diet plan was the least restrictive means to

10  further two compelling government interests: prison security and avoidance of extraordinarily

11  expensive food service plans.

12         Prison security is a compelling government interest. *See Cutter*, 544 U.S. at 725, n.13.

13  Defendants adequately demonstrate that prison security would be adversely impacted by

14  accommodating Curry's Kemetic diet request. Prison security is maintained by the presence of

15  correctional staff enforcing rules and regulations, escorting inmates, searching inmates for

16  contraband, and responding to emergencies in prison. The uncontroverted evidence shows that the

17  CDCR has a finite number of correctional staff members and that diverting a member of the

18  correctional staff for a shopping trip would adversely affect prison safety and security. To obtain just

19  Curry's Kemetic diet would take one prison employee about 6-7 hours per week. While spending

20  almost 20% of a 40-hour work week tending to the Kemetic diet, that correctional staff member

21  would not be able to tend to custodial responsibilities. The evidence also shows that, unlike the

22  vegetarian, kosher and halal diets that can be provided using existing food vendors, an outside

23  shopping trip by a member of the correctional staff would be necessary to accommodate the Kemetic

24  diet request. Curry has not provided competent evidence showing any other way CDCR can fully

25  accommodate his diet without impacting security. Therefore, limiting inmates to the currently-

26  available CDCR diets is the least restrictive means of ensuring the compelling state interest of prison

27  security, as it maintains the same number of correctional staff to ensure prison security. As

28

United States District Court

For the Northern District of California

1    mentioned above, Defendants presented evidence that sending a guard out to shop means *e.g.*, that

2    the guard is not present in the prison to monitor inmates and maintain safety.

3           The evidence also shows a compelling government interest in avoiding a meal plan that is

4    extraordinarily expensive to provide.  The evidence is undisputed that the total cost for purchasing,

5    shopping, preparing, delivering, and storing Curry's requested Kemetic diet would be approximately

6    $50,422.95 to $60,994.95 per year.  The Kemetic diet Curry requested is dramatically more

7    expensive than the standard diet and all the other religious diets.[3]  While there may be some question

8    whether avoidance of a negligible cost increase is a compelling state interest, the $50,000+ extra

9    expense to provide the Kemetic diet for one inmate is not a negligible cost increase.  The food alone

10   is more than ten times the cost of the food for the standard diet, and almost three times as much as

11   the food for the most expensive other religious diet.  The daily food costs are: $2.82 (standard),

12   $3.20 (vegetarian), $3.50 (religious-meat-alternate), $9.28 (kosher), and $26.03 (Kemetic).  Further,

13   the evidence is undisputed that CDCR's total yearly food budget for its 140,000 inmates is

14   approximately $233 million, which includes the direct cost of the food and the labor cost related to

15   the food.  The average total cost is $1664 per inmate to purchase and prepare food.  It is undisputed

16   that accommodating Curry's request for a Kemetic diet at a yearly cost of $50,000+ – more than

17   thirty times than the average per inmate cost – would inevitably impact CDCR's ability to

18   accommodate other inmates' dietary needs.  The CDCR's departmental food administrator analyzed

19   the cost and logistical issues involved in accommodating the Kemetic diet request and found that

20   providing the diet would be costly, infeasible, and inconsistent with a simplified, efficient food

21

22

23

-------

24       [3] The cost is substantial, even if Curry is the only one on this diet.  However, there are more
     Neterians in the CDCR system than just Curry.  There were more than twenty Neterians at Salinas
25   Valley's C Facility.  *See* Docket # 34-1.  And other Neterians have filed civil rights actions pressing
     similar demands for Kemetic diets.  *See, e.g., Furnace v. Arceo*, N. D. Cal. Case No. C 06-4609
26   MMC (summary judgment granted for defendants); *Cotton v Cate*, N.D. Cal. Case No. 09-385 WHA
     (appeal pending following entry of summary judgment for defendants).  Although it likely would not
27   cost $50,000-$60,000 for every inmate requesting the diet because some costs could be spread over
     the group, the annual food cost of $9,500 per inmate would remain and still would be almost ten
28   time the food cost of the standard diet for an inmate.

United States District Court

For the Northern District of California

1    service.  Accommodating the Kemetic diet request would impose an unreasonable burden on other

2    inmates, the prison staff, and taxpayers.[4]

3        To be sure, the cost of accommodating Curry alone though significant, might not break the

4    bank.  However, if Curry were to be accommodated by providing a menu outside the existing set

5    diet options, other inmates would likely have to be accommodated as well, ultimately at tremendous

6    expense to the CDCR.  His request cannot be assessed in isolation.

7        It is not surprising therefore that courts generally have recognized cost containment as a

8    compelling state interest under RLUIPA.  *See, e.g., Linehan v. Crosby*, 346 F. App'x 471, 473 (11th

9    Cir. 2009) (affirming summary judgment for defendants on RLUIPA claim; the Department of

10   Corrections "has a compelling governmental interest in keeping costs down and preventing security

11   risks.  The [Department of Corrections] submitted affidavits showing that its current policy of

12   providing vegan and vegetarian meals instead of kosher meals was the least restrictive means of

13   furthering the compelling governmental interests of keeping costs down and preventing security

14   risks"); *Muhammad v. Sapp*, 388 F. App'x 892, 897 (11th Cir. 2010) (affirming summary judgment

15   for defendants on RLUIPA claim by Orthodox Sunni Muslim who wanted an "alcohol-free lacto-

16   vegetarian diet 'prepared with and served on non-disposable utensils'" not subject to potential cross-

17   contamination; corrections department "submitted affidavits establishing that its policy of providing

18   alternative entree meals and vegan meals was the least restrictive means of furthering its compelling

19   governmental interest in cost containment"); *Via v. Wilhelm*, 2011 WL 5419709, *6 (W.D. Va.

20   2011) (rejecting RLUIPA claim by Muslim inmate who wanted halal meat (at a cost of $6.00 per

21   day) rather than soy protein substitute (at a cost of $2.85 per day) because his religion required him

22   to eat halal meat daily; court explains at length that management of costs is a compelling interest

23   supporting corrections department's decision to offer a substitute protein that is inoffensive to a

24   broad range of religions); *Jova v. Smith*, 582 F.3d 410, 415-16 (2d Cir. 2009) (addressing RLUIPA

25   claim by Tulukeesh inmates who claimed their religion required that they eat only a complex, highly

26

27        [4] Defendants also argue that there may be food quality issues with unapproved vendors.  The
28   evidence is insufficient for the Court to determine that food safety concerns support the denial of the
     Kemetic diet.

**United States District Court**
For the Northern District of California

regimented non-soybean-based vegan diet; finding that government's voluminous evidentiary presentation showed that compelling administrative and security interests); *id.* at 417 (district court properly found that the administrative burden of providing plaintiff's requirements of "specific foods (and portions thereof) on individual days of the week, and that such foods be prepared by Tulukeesh adherents" justified defendants' refusal to comply with plaintiff's demands and that there was no less restrictive alternative to these specific requests); *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007) (upholding summary judgment for defendants on RLUIPA claim; the uncontroverted evidence about the costs and diversion of resources established that the policy of not providing the requested kosher meal plan was "related to maintaining good order and controlling costs and, as such, involves compelling governmental interests"); *see also Jova*, 582 F.3d at 417 (remanding for district court to consider whether there is a less restrictive substitute (such as a vegetarian diet) to the current religious alternative menu that included non-red meat- and non-pork-based meals); *Keesh v. Smith*, 2011 WL 1135929 (N.D.N.Y. 2011) (granting summary judgment for defendants on RLUIPA claim on remand from *Jova*, *supra*; "Given plaintiffs' insistence on a vegan diet, there is no diet consistent with defendants' administrative and security interests that would be less restrictive to them than the [religious alternative menu]; thus, defendants have not failed to offer the least restrictive alternative").  The Court notes that the federal Bureau of Prisons takes into account budget constraints in administering its religious diet program.  *See* 28 C.F.R. § 548.20 ("The Bureau provides inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the security and orderly running of the institution and the Bureau through a religious diet menu."

        Defendants show that rejecting Curry's request for a Kemetic diet and directing him to use the existing religious diet plans was the least restrictive means to further these compelling governmental interests in prison security and avoidance of extraordinarily high meal service costs. Defendants present evidence that they have considered and rejected the efficacy of less restrictive measures but found that CDCR's existing religious diet program with four diet options reasonably accommodated the nutritional and religious needs of the inmates.  There are no easy, reasonably inexpensive ways to accommodate Curry's Kemetic diet request.  The Kemetic diet cannot be

United States District Court
For the Northern District of California

1   prepared from the food available from existing food vendors.  Curry fails to controvert the evidence

2   that the limited number of diets within CDCR prisons is necessary in order to run a simplified,

3   efficient food system for 140,000 inmates that does not use a disproportionate share of CDCR's

4   limited financial resources.  CDCR's decision to accommodate inmate religious needs with the four

5   existing diets – standard diet, vegetarian diet, halal meat diet, and kosher diet – and the resulting

6   refusal to provide the Kemetic diet to Curry is the least restrictive means of furthering the

7   compelling governmental interests of prison security and avoidance of extraordinarily high costs.

8           Curry argues in opposition that he never requested *organic* meals and never requested that

9   the food be non-GMO and non-irradiated.  Docket # 71, p. 2.  The evidence flatly contradicts his

10  argument, and he cannot avoid summary judgment with this last-minute change in position.  Even if

11  Curry never wrote the exact words, "I demand a diet that excludes genetically modified and

12  irradiated foods," his request to prison officials incorporated by reference a document that did

13  impose just such a requirement.  The evidence is undisputed that, in his 2007 inmate appeal, Curry

14  requested a "vegetarian diet that is mandated by [his] faith.  The diet that is required is described on

15  page 3."  Docket # 32-1, p. 5.  The attachment to the inmate appeal was the Special

16  Accommodations handout, and page 3 of that handout plainly states that the Kemetic diet has "no

17  genetically modified food" and "no irradiated food," just as it states that the Kemetic diet has "no

18  meat" and "no candy, refined sugar or table salt."  Docket # 32-1, p. 12.  Curry also joined in a

19  group inmate appeal that made the same Kemetic diet request, attached the same handout, and

20  directed the reader to the same page to learn the details of the requested diet.  Prison officials

21  reasonably understood the requests to be for the diet described on page 3 of the handout attached to

22  the inmate appeals.[5]

23

24

---

25       [5]  If the inmate appeal was a pleading, the Court would have no hesitation in reading it as
26  incorporating the Kemetic diet requirements described on page 3 of the Special Accommodations
    handout.  *Cf.* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is
27  a part of the pleading for all purposes"); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674 (2d Cir.
    1995) ("An appended document will be read to evidence what it incontestably shows once one
28  assumes that it is what the complaint says it is (or, in the absence of a descriptive allegation, that it is
    what it appears to be).")

United States District Court

For the Northern District of California

Further, not only did Curry write to prison officials that he wanted the Kemetic diet described on page 3 of the Special Accommodations handout, he took that position in this litigation until Defendants presented evidence showing the extraordinarily high cost of such a diet.[6]  Indeed, before Defendants showed the cost for the organic vegan diet, Curry brushed aside cost concerns with the argument that "[t]here is simply no evidence that organic whole foods would be expensive." Docket # 42, p. 10.  No reasonable jury could find that Curry had not requested a Kemetic diet that excluded GMO and irradiated food.  *Cf. Scott v. Harris*, 550 U.S. 372, 380-83 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

Moreover, Curry's change in position three years into the litigation would create an exhaustion problem for him, *i.e.*, he did not exhaust administrative remedies for his claim that he wanted merely vegan food before filing this action.[7]  His change in focus makes him like the prisoner in *Sefeldeen v. Alameida*, 238 F. App'x 204 (9th Cir. 2007), whose change in focus caused his claim properly to be rejected as unexhausted.  The *Sefeldeen* prisoner's inmate appeals "focused on the perceived nutritional inadequacy of the vegetarian diet, not that eating vegetarian meals violated his religious beliefs."  *Id.* at 206.  Although the *Sefeldeen* prisoner claimed in court that the vegetarian diet violated his religious beliefs, he "did not argue that vegetarianism violated his beliefs at the administrative level, and therefore, as found by the district court, did not properly exhaust that

---

[6] Curry stated under oath that he requested prison officials in or about April 2007 "to provide me with a vegetarian/vegan diet based on my Shetaut Neter faith as described above.  I provided to these defendants a true & correct copy of Exhibit A, from my spiritual preceptor-priest Dr. Muata Ashby describing the Shetaut Neter religion, its tenets & *the Kemetic diet, and the prohibited foods.*  (*See* Ex. A, at p. 3)."  *See* Docket #1, pp. 14, 21.  In later describing that declaration, Curry wrote:  "In Curry's verified complaint declaration, it was asserted that one of the central tenets of his faith mandates a strict vegan diet, which is a sincerely held belief of his, prohibiting all meat and meat-by-products, wheat, refined sugar, table salt, *generically (sic) modified and irradiated food.*"  Docket # 42, p. 4 (emphasis added).

[7] Curry also mentions in his filings in this litigation his lactose and wheat intolerance, but there is no evidence that he mentioned his food intolerances to prison officials in the course of requesting his Kemetic diet.  He thus is unlike the prisoner in *Shakur*, who "contended throughout the administrative grievance process" and in the litigation that the vegetarian diet offered by prison officials caused gastro-intestinal problems that interfered with his religious exercise.  *See Shakur*, 514 F.3d at 882.

**United States District Court**
For the Northern District of California

1    issue." *Id.* (citing *Cutter*, 544 U.S. at 723 n.12 ("State prison officials make the first judgment about

2    whether to provide a particular accommodation, for a prisoner may not sue under RLUIPA without

3    first exhausting all available administrative remedies.")) As Defendants argue in their reply brief ,

4    the introduction of a new theory of liability at the summary judgment stage can prejudice a

5    defendant with different burdens and defenses, and that is just what would occur if Curry is allowed

6    to change his claim for the denial of a Kemetic diet to be one for denial of a vegan diet. *See* Docket

7    # 78, p. 8 (citing *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1292 (9th Cir. 2000)).

8            Curry asserts that other prison and jails offer vegan meal service, suggesting that it would be

9    easy for the CDCR to do so.  "[C]omparisons between institutions [are] analytically useful when

10   considering whether the government is employing the least restrictive means." *Warsoldier*, 418

11   F.3d at 1000 (rigid hair grooming policy was not least restrictive means to ensure security where

12   other institutions accommodated religious practices allowing long hair).  Curry offers no competent

13   admissible evidence to support his assertion that vegan diets are available at other institutions, and

14   he provides no details about the content or costs of such vegan offerings.  Even if his evidence that

15   vegan diets are served at other institutions was competent and admissible, it would not establish a

16   triable issue because the Kemetic diet requested was more specific than just a vegan diet – it had to

17   exclude GMO and irradiated foods, as explained above.  Also, the vegan diets that may be available

18   at other institutions may include other ingredients prohibited by the Kemetic diet, such as table salt,

19   refined sugar, or wheat.  Further, the vegan diets that may be available at other institutions may not

20   satisfy the requirement that the diet be 80% raw/20% cooked vegetables and fruit.  No reasonable

21   jury could conclude that the vegan meals that might be available at other institutions or purchased

22   from existing CDCR food brokers would comply with the Kemetic diet request which requires

23   purchases from non-vendors.  A standard vegan diet might be closer to Curry's desire than a

24   religious-meat-alternate diet or a vegetarian diet, but that does not resolve the constitutional or

25   RLUIPA issues.  For example, a vegetarian diet likely would be closer than a standard diet, but

26   Curry rejected the vegetarian meal plan that was offered him.  *See* Docket # 1, p. 15.

27           Even viewing the evidence in the light most favorable to Curry, Defendants' rejection of the

28   request for a Kemetic diet in place of one of the diets available under the existing religious meal

1  plan was necessary as the least restrictive means to further compelling government interests of

2  prison security and avoidance of extraordinarily high meal costs.  Defendants are entitled to

3  judgment as a matter of law on the claim that the denial of a Kemetic diet to Curry violated his

4  rights under RLUIPA.[8]

5  B.     First Amendment Religious Freedom Claims

6          The First Amendment provides that "Congress shall make no law respecting an

7  establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend I.  "The first

8  of the two Clauses, commonly called the Establishment Clause, commands a separation of church

9  and state.  The second, the Free Exercise Clause, requires government respect for, and

10  noninterference with, the religious beliefs and practices of our Nation's people."  *Cutter*, 544 U.S. at

11  719.  Curry asserts challenges under both clauses.

12          1.     Free Exercise Claim

13          Under the Free Exercise Clause, prisoners "have the right to be provided with food sufficient

14  to sustain them in good health that satisfies the dietary laws of their religion."  *Ward v. Walsh*, 1

15  F.3d 873, 877 (9th Cir. 1993) (quoting *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987)).  The

16  free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed

17  in order to achieve legitimate correctional goals or to maintain prison security.  *O'Lone v. Shabazz*,

18  482 U.S. 342, 348-49 (1987).  In order to establish a free exercise violation, a prisoner must show a

19  defendant burdened the practice of his religion without any justification reasonably related to

20  legitimate penological interests.  *See Shakur*, 514 F.3d at 883-84.  As Curry offers evidence that he

21  was denied the Kemetic diet that he wanted for religious exercise, the analysis of his Free Exercise

22

23

24

25

─────────────

26          [8]  It may be that, due to its extraordinarily high cost relative to the diets offered to other
prisoners,  providing the Kemetic diet would pose an Establishment Clause problem but the Court
27  need not decide that issue because it has not found that the Kemetic diet is required under RLUIPA.
*See Cutter*, 544 U.S. at 724 (emphasizing that Court was upholding RLUIPA against a facial
28  challenge and that respondents "have not contended that under the facts of any of [petitioners']
specific cases . . . [that] applying RLUIPA would produce unconstitutional results").

United States District Court
For the Northern District of California

1    claim turns on whether the denial was reasonably related to legitimate penological interests.  *See*

2    *O'Lone*, 482 U.S. at 349 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).[9]

3          The Supreme Court has identified four factors for courts to consider when determining

4    whether a regulation or practice is reasonably related to legitimate penological interests:  (1) whether

5    there is a "'valid, rational connection' between the prison regulation and the legitimate

6    governmental interest put forward to justify it"; (2) "whether there are alternative means of

7    exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the

8    asserted constitutional right will have on guards and other inmates, and on the allocation of prison

9    resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule

10    at issue is an "'exaggerated response' to prison concerns."  *Turner*, 482 U.S. at 89-90.  The task in

11    considering the *Turner* factors is not to balance the four factors, but, rather, to determine whether the

12    state shows a "reasonable" relation between the policy and legitimate penological objectives, rather

13    than simply a "logical" one.  *Beard v. Banks*, 548 U.S. 521, 533 (2006).  While all justifiable

14    inferences must be drawn in the prisoner-plaintiff's favor with respect to matters of disputed fact,

15    the Court's inferences must accord deference to the views of prison authorities in disputed matters of

16    professional judgment.  *See id.* at 529-30.

17          With respect to the first *Turner* factor, the evidence shows a rational and valid connection

18    between the CDCR's religious diet program (with four meal options and disallowance of the

19    Kemetic diet request) and a legitimate governmental interest.  The "orderly administration of a

20    program that allows . . . prisons to accommodate the religious dietary needs of thousands of

21    prisoners" is a legitimate governmental interest.  *Resnick v. Adams,* 348 F.3d 763, 769 (9th Cir.

22    2003) (first *Turner* factor satisfied because requiring inmate to fill out a standardized form to obtain

23    a religious diet was rationally connected to the orderly administration of the common fare program

24    in federal prison system); *see also Sefeldeen*, 238 F. App'x at 206 ("the legitimate governmental

25    interest is to reasonably accommodate thousands of inmates' religious dietary needs while also

26    considering budgetary, staff, and security limitations").  The CDCR has a legitimate government

---

28       [9] The *Turner* test applies to the constitutional claims, but not the RLUIPA claim.
   *See Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th Cir. 2008).

**United States District Court**
For the Northern District of California

1   interest in running a simplified and efficient food system.  The Kemetic diet is unlike any of the

2   dietary options that CDCR currently serves, and cannot be provided without significantly deviating

3   from that simplified and orderly food system that allows 140,000 inmates to be fed within a finite

4   budget.  There is a valid rational connection between prison officials' refusal to provide Curry with a

5   Kemetic diet and their legitimate budgetary and security concerns.  *See Shakur*, 514 F.3d at 878

6   (prison could rationally conclude that denying kosher diet to Muslim inmate would simplify its food

7   service and reduce expenditures); *Ward*, 1 F.3d at 877 ("Since the policy of not providing special

8   diets is related to simplified food service, the first factor weighs in favor of the government").  The

9   first *Turner* factor weighs in favor of Defendants.

10          The second *Turner* factor is "whether there are alternative means of exercising the right that

11  remain open to prison inmates."  *Turner*, 482 U.S. at 89-90.  The denial of the Kemetic diet did not

12  deprive Curry of all means of exercising his Shetaut Neter religion.  It is not disputed that Curry was

13  able to engage in some Neterian worship without the religious diet.  *See O'Lone*, 482 U.S. at 352-53

14  (although there were no alternative means for the prisoners on work detail to attend Jumu'ah

15  services, the prisoners nevertheless retained their ability to participate in other Muslim religious

16  ceremonies and practices, and that ability supported the reasonableness of the restriction).  Curry

17  could attend occasional Shetaut Neter group worship services.  *See* Docket # 34-1 and # 34-2.  Curry

18  also could engage in in-cell worship three times a day.  Docket # 1, p. 15.  He could study the

19  Shetaut Neter written materials he had, and could practice the Neterian teachings he had learned.

20  *See id.* at 13.  Curry retained "the ability to participate in other significant rituals and ceremonies" of

21  his faith, even if some aspects of religious practice are impinged upon.  *See Ward*, 1 F.3d at 877.

22  Also relevant to the second *Turner* factor is whether the prison policy requires the prisoner to do

23  something forbidden by his religion rather than be unable to do something that is a positive

24  expression of his belief.  *See Ward*, 1 F.3d at 878.  On this point, Curry's evidence is mixed:  his

25  evidence indicates that the Shetaut Neter leader views the Kemetic diet as desirable and

26  recommended for Neterians, while Curry seems to state that consumption of animals, animal

27  byproducts, wheat, refined sugar and table salt is forbidden.  *See* Docket # 1, p. 13.  The Court will

28  assume for present purposes that non-vegan food is forbidden.  The second *Turner* factor weighs in

United States District Court

For the Northern District of California

1    favor of Curry, although not heavily so because he retains the opportunity to engage in other

2    Neterian practices.

3          The third *Turner* factor requires the Court to consider the "impact accommodation of the

4    asserted constitutional right will have on guards and other inmates, and on the allocation of prison

5    resources generally." *Turner*, 482 U.S. at 90.  Accommodating the Kemetic diet request would

6    adversely impact prison security, as it would divert almost 20% of one correctional staff member's

7    time to tend to the diet for this one inmate – time during which this correctional staff member would

8    be unable to help with security needs.  He or she would be unable to provide the routine deterrence

9    of inmate misbehavior that comes from staff being present, and would be unable to assist in prison

10   emergencies that might arise during the shopping trips that would take him or her away from the

11   prison.  Accommodating the Kemetic diet request also would negatively impact the resources for

12   other prisoners' food service, as the evidence shows that the CDCR's food operations have a finite

13   budget.  The extra amount spent on the Kemetic diet would reduce the amount available for other

14   inmates' food.  The evidence also is undisputed that providing one inmate with this special diet

15   almost certainly would prompt resentment from other inmates and more requests for more and

16   perhaps different religious diets.  "This effect, however, is present in every case that requires special

17   accommodations for adherents to particular religious practices.  While not irrelevant, it is not in

18   itself dispositive." *Ward*, 1 F.3d at 878.  Nonetheless, there would be administrative difficulties and

19   an impact on the efficient operation of food services if a special meal was provided for one prisoner.

20   *See id.*  The third *Turner* factor weighs in favor of Defendants.  *See DeHart v. Horn*, 390 F.3d 262,

21   271-72 (3d Cir. 2004) (providing religious vegan diet would burden prison administration because it

22   would require specialized ordering and preparation of food and individualized preparation of meals

23   in kitchen designed for bulk food preparation).

24         The fourth *Turner* factor requires the Court to consider whether there is an "absence of ready

25   alternatives" to the prison policy.  *Turner*, 482 U.S. at 90.  The burden is on the prisoner challenging

26   the regulation to show that there are obvious, easy alternatives to the regulation.  *See O'Lone*, 482

27   U.S. at 350; *see also Mauro v. Arpaio*, 188 F.3d 1054, 1063 (9th Cir. 1999).  Curry does not put

28   forth a ready alternative to Defendants' religious diet policy that would accommodate his Kemetic

United States District Court

For the Northern District of California

1   diet at a minimal cost to Defendants' legitimate budgetary and security concerns without devotion of

2   special and extraordinary resources. *Cf. Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir.

3   1997) (reversing and remanding on free exercise claim because lower court had not taken into

4   consider evidence that a variety of foodstuffs could be assembled to provide meals that were

5   consistent with kosher diet request where "most of these things are 'off the shelf' and nothing in the

6   record suggests that the cost would be appreciable.")  Curry argues that other prison and jails offer

7   vegan meal service, suggesting that the CDCR could do the same.  As explained earlier, the

8   possibility that other facilities offer vegan meals does not show a ready alternative because the

9   requested Kemetic diet was more restrictive than just a vegan diet, *i.e.*, it excluded GMO and

10  irradiated foods; it excluded table salt, refined sugar, or wheat; and it had to have 80% raw/20%

11  cooked vegetables and fruit.  Defendants satisfy the fourth *Turner* factor.

12         Having considered the various *Turner* factors, the Court concludes that Curry does not show

13  or raise a triable issue of fact that his right to free exercise of religion was improperly impinged

14  upon by Defendants.  Defendants are entitled to judgment in their favor on Curry's First Amendment

15  claim.

16         2.    Establishment Clause Claim

17         Curry contends that Defendants violated the Establishment Clause of the First Amendment

18  by providing religious diets for Muslim and orthodox Jewish inmates.  Docket # 1, p. 4.

19         A state regulation or practice "does not violate the Establishment Clause if (1) the enactment

20  has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and

21  (3) it does not foster an excessive entanglement with religion." *Collins v. Chandler Unified Sch.*

22  *Dist.*, 644 F.2d 759, 762 (9th Cir.) (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)), *cert. denied*,

23  454 U.S. 863 (1981).  Entanglement may also be treated as an aspect of the inquiry into a statute's

24  effect. *See Agostini v. Felton*, 521 U.S. 203, 233-34 (1997) (federally funded program allowing

25  remedial instruction on premises of sectarian schools does not have effect of advancing religion

26  where it does not result in governmental indoctrination, define its recipients by reference to religion,

27  or create an excessive entanglement).  Under the *Lemon* test with the *Agostini* refinement, the

28  inquiry under the second prong is (a) "'whether the government acted with the purpose of advancing

22

1   or inhibiting religion,'" and (b) "'whether the [governmental] aid has the "effect" of advancing or

2   inhibiting religion.'"  *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1055 (9th Cir. 2007)

3   (quoting *Agostini*, 521 U.S. at 222-23).

4          Curry fails to show a triable issue of fact that the CDCR's religious diet program violated the

5   Establishment Clause.  CDCR's religious diet program offered the several diets for the permissible

6   secular purpose of facilitating religious practice within prison and not for the purpose of advancing a

7   particular religion.  The primary effect of the religious diet program neither advanced nor inhibited

8   religious practice.  The religious diet program allowed inmates to select a standard diet even without

9   a religious connection.  And the religious diet program offered a vegetarian diet that was not

10  tethered to any particular religion and was available to accommodate a variety of religious, personal

11  or ethical beliefs.  Finally, the existing religious diet program did not foster an unreasonable

12  entanglement with religion.  Government efforts to accommodate religion are permissible when they

13  simply remove burdens on the free exercise of religion.  *Corp. of Presiding Bishops of Church of*

14  *Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 348 (1987).  On the undisputed evidence,

15  no reasonable jury could find that the CDCR's religious diet program violated the Establishment

16  Clause.

17  C.     Equal Protection Claim

18         Curry contends that prison officials treated him differently than inmates of other faiths, in

19  violation of his rights under the Equal Protection Clause of the Fourteenth Amendment.  He

20  contends that prison officials provided members of other religions their religiously-mandated diets

21  while denying him his religiously-mandated diet.  *See* Docket # 1, p. 5.

22         "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

23  'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

24  direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne*

25  *Living Center*, 473 U.S. 432, 439 (1985).  In the prison context, the Equal Protection Clause requires

26  that an inmate who is an adherent of a minority religion be afforded a "reasonable opportunity of

27  pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to

28  conventional religious precepts," *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (Buddhist prisoners must

United States District Court

For the Northern District of California

1    be given opportunity to pursue faith comparable to that given Christian prisoners), as long as the

2    inmate's religious needs are balanced against the reasonable penological goals of the prison, *O'Lone*

3    *v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). *Allen v. Toombs*, 827 F.2d 563, 568-69 (9th Cir.

4    1987). A prisoner cannot prevail on his equal protection claim "if the difference between the

5    defendants' treatment of him and their treatment of [other] inmates is 'reasonably related to

6    legitimate penological interests.'" *Shakur*, 514 F.3d at 891 (9th Cir. 2008) (citations omitted).

7            Curry fails to show a triable issue of fact in support of his equal protection claim. He points

8    out that Muslim and Jewish inmates were able to obtain diets consistent with their faith, but that

9    alone is not enough to show an equal protection violation. Prisons need not provide identical

10   facilities or services to different faiths, but must make good faith accommodation of the prisoners'

11   rights in light of practical considerations. *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir.

12   1997), *overruled on other grounds as stated in Shakur*, 514 F.3d at 884-85. The same *Turner*

13   analysis that requires rejection of Curry's free exercise claim requires rejection of his equal

14   protection claim. The legitimate penological interests of cost control, a simplified and efficient food

15   service plan, and security concerns justified the decision not to provide the Kemetic diet while

16   offering a religious diet plan that had some diets that were consistent with other inmates' religions.

17   Having considered the several *Turner* factors, the Court concludes that Curry does not show or raise

18   a triable issue of fact that his right to equal protection was improperly impinged upon by

19   Defendants. Defendants are entitled to judgment in their favor on Curry's Fourteenth Amendment

20   Equal Protection Clause claim.

21   D.      Qualified Immunity Defense

22           Defendants are entitled to qualified immunity against the First and Fourteenth Amendment

23   claims with regard to the religious diet. The defense of qualified immunity protects government

24   officials "from liability for civil damages insofar as their conduct does not violate clearly established

25   statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

26   *Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an official is entitled to qualified

27   immunity, the Court must decide whether the facts alleged show the official's conduct violated a

28   constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was

**United States District Court**
For the Northern District of California

unlawful in the situation he confronted. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s requirement that qualified immunity analysis proceed in a particular sequence). "[I]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. The Court has concluded that the evidence fails to show a violation of Curry's First or Fourteenth Amendment rights with regard to the religious diets. Therefore, Defendants prevail on the first prong of the *Saucier* test. Furthermore, for the reasons stated above, the failure to accommodate Curry's particular dietary needs did not violate clearly established law. As a matter of law, Defendants are entitled to qualified immunity against the First and Fourteenth Amendment claims with regard to the religious diet request.

## V.   DISCUSSION

For the foregoing reasons, Defendants' renewed motion for summary judgment is **GRANTED**. (Docket # 58.) In the March 21, 2012 Order, the Court determined that Defendants were entitled to judgment as a matter of law on Plaintiff's RLUIPA, First Amendment and Fourteenth Amendment claims with regard to the denial of his requests for religious oil. In the present Order, the Court has determined that Defendants are entitled to judgment as a matter of law on Plaintiff's RLUIPA, First Amendment and Fourteenth Amendment claims with regard to the denial of his requests for a Kemetic diet. Accordingly, judgment will be entered in Defendants' favor and against Plaintiff.

IT IS SO ORDERED.

Dated:  January 4, 2013

_____
EDWARD M. CHEN
United States District Judge